## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ADRIAN SMITH, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No: 17-cv-00286 |
| BANK OF AMERICA, N.A., BANK OF AMERICA CORPORATION, and ADECCO USA, INC., | ) ) ) | Judge Andrea R. Wood |
| Defendants. | ) ) | |

### DEFENDANT ADECCO USA, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

Defendant, Adecco USA, Inc. ("Adecco" or "Defendant"), submits the following memorandum in support of its Motion to Stay and Compel Arbitration.

Plaintiff and Adecco entered into a Dispute Resolution and Arbitration Agreement for Consultants/Associates that requires all disputes, claims or controversies arising out of or relating to the employment relationship between the parties (or the termination of the employment relationship) to be resolved by binding arbitration enforced under and subject to the FAA, 9 U.S.C. §§ 1, *et seq.* Furthermore, Plaintiff agreed that all disputes, claims or controversies arising out of or relating to Plaintiff's temporary work assignment with BOA is also subject to binding arbitration.

### BACKGROUND

On January 13, 2017, Plaintiff filed suit on behalf of herself and a purported class of similarly situated laborers in a two-count Complaint alleging that Adecco violated the Fair Labor

1



Standards Act, 29 U.S.C. § 201 *et seq.*, and the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.* ("IMWL").

Plaintiff alleges that during her employment with BOA in Chicago, Illinois, from approximately July to October 2015, *see* Compl. at ¶¶ 16-17, she was allegedly paid forty (40) hours per week despite routinely working in excess of that number, *id.* at ¶¶ 17-18, in violation of the FLSA and IMWL. *Id.* at ¶¶ 23, 50-52, 57-59.

When she began employment with Adecco, Plaintiff entered into a mutually enforceable Dispute Resolution and Arbitration Agreement for Consultants/Associates (the "Agreement"). A copy of the Agreement is attached as Exhibit B to the Declaration of Rachel Prentiss, which is attached as Exhibit 1 (the "Prentiss Decl.").

The Agreement establishes that Plaintiff and Adecco agreed "that any and all disputes, claims or controversies arising out of or relating to this Agreement, the employment relationship between the parties, or the termination of the employment relationship, shall be resolved by binding arbitration in accordance with the Employment Arbitration Rules of the American Arbitration Association [("AAA")] . . . ." *See* Prentiss Decl., Exh. B, ¶ 1. The parties further agreed that the Arbitration "Agreement shall be enforceable under and subject to the Federal Arbitration Act, 9 U.S.C. Sec. 1, *et seq.*" Prentiss Decl., Exh. B, ¶ 1.

The Agreement further contains the following provisions:

7. **BY SIGNING THIS AGREEMENT, THE PARTIES AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS AND/OR COLLECTIVE PROCEEDING.**

8. **FURTHERMORE, BY SIGNING THIS AGREEMENT, THE PARTIES AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN THEIR INDIVIDUAL CAPACITY AND NOT IN ANY REPRESENTATIVE PROCEEDING UNDER ANY**

2

> **PRIVATE ATTORNEY GENERAL STATUTE ("PAGA CLAIM"), UNLESS APPLICABLE LAW REQUIRES OTHERWISE. IF THE PRECEDING SENTENCE IS DETERMINED TO BE UNENFORCEABLE, THEN THE PAGA CLAIM SHALL BE LITIGATED IN A CIVIL COURT OF COMPETENT JURISDICTION AND ALL REMAINING CLAIMS WILL PROCEED IN ARBITRATION.**

Prentiss Decl., Exh. B, ¶¶ 7-8 (emphasis in original).

The Agreement also provides that, within 30 days of execution, Plaintiff could opt out of the Agreement by submitting to Adecco a "'Dispute Resolution and Arbitration Agreement for Consultants/Associates Opt Out Form' that can be obtained from the Company local branch representative." *See* Prentiss Decl., Exh. B, ¶ 9. Plaintiff never exercised her right to opt out of the Agreement. *See* Prentiss Decl., ¶ 17. Therefore, Plaintiff's claims against Adecco are subject to resolution through individual, binding arbitration pursuant to the Agreement.

Finally, the Agreement provides that:

> ... a Client and its affiliates are intended to be third party beneficiaries to this Dispute Resolution Agreement. Although the Client and its affiliates are not the Employee's employer, any disputes that may be asserted against Client or its affiliates due to Employee's temporary work assignment at Client shall be resolved pursuant to this Dispute Resolution Agreement in the same manner as claims made against the Company.

Prentiss Decl., Exh. B, ¶ 10. Thus, Plaintiff's claims against BOA are subject to resolution through individual, binding arbitration pursuant to the Agreement. Adecco respectfully seeks an Order staying this case and compelling arbitration.

## ARGUMENT

The Agreement is valid, enforceable, and supported by public policy under both the Federal Arbitration Act ("FAA") and Illinois contract law. The contractual elements are satisfied and the provisions of the Agreement are neither unconscionable nor illegal. While some courts have taken issue with class action waivers, Adecco did not coerce, restrain, or interfere with

3

Plaintiff's rights. To the contrary, it allowed Plaintiff a meaningful opportunity to opt out of the Agreement. Even if the Court were to find the Agreement contains a provision prohibited by governing law, the Agreement allows for severability. Therefore, this Court should find the Agreement is enforceable, compel arbitration, and stay proceedings.

## I.     The FAA Governs the Agreement.

The Agreement is governed by the FAA. *See* Prentiss Decl., Exh. B, ¶ 1. The United States Supreme Court has ruled that the FAA requires enforcement of arbitration agreements in the employment context. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001).

The FAA applies to all arbitration agreements involving interstate commerce. *Perry v. Thomas*, 482 U.S. 483, 489 (1987); *see Prima Paint Corp. v. Flood & Conklin Mfg., Co.*, 388 U.S. 395, 401-02 n.7 (1967) (finding the requirements of Section 2 of the FAA are met even when the contractual activity only tangentially facilitates or affects commerce). The FAA mandates that any agreement to resolve a dispute by arbitration "shall be valid, irrevocable, and enforceable," and authorizes a court to compel arbitration as circumstances dictate, including in the employment context. 9 U.S.C. §§ 2-4; *see Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 35 (1991).

Plaintiff alleges, and Adecco admits, that Adecco is a foreign corporation. *See* Compl. ¶¶8-11, 47. Adecco is engaged in interstate commerce by conducting employment staffing services in 47 states. *See* Prentiss Decl., ¶ 1. Moreover, the Agreement specifically provides that it shall be enforceable under and subject to the FAA. *See* Prentiss Decl., ¶ 1. Therefore, the Agreement constitutes a "contract evidencing a transaction involving commerce" under the FAA.

A court must compel arbitration under the FAA if it determines (1) that a valid and enforceable arbitration agreement exists between the parties, and (2) that the dispute before it

4

falls within the scope of the agreement. *See Harter v. Iowa Grain Co.*, 220 F.3d 544, 549 (7th Cir. 2000); *see also Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626-28 (1985). Each element is satisfied in this case. Considering the "'liberal federal policy favoring arbitration,' and the 'fundamental principle that arbitration is a matter of contract[,]'" the FAA applies in this case. *See Gilmer*, 500 U.S. at 26; *AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

**II.     The Agreement is an Enforceable Contract.**

The FAA "makes clear that arbitration agreements are enforceable except for state-law grounds for ordinary contract revocation." *Id.* (citing 9 U.S.C. § 2); *see also Perry v. Thomas*, 482 U.S. 483, 492 n.9 (notions of contract validity, revocability and enforceability apply to arbitration agreements).

Here, all of the relevant events occurred in Illinois; therefore, Illinois law controls. The Agreement is an enforceable contract under Illinois, because it satisfies all required elements to establish a valid contract: offer, acceptance, consideration, and the absence of valid defenses. Moreover, the Agreement is neither unconscionable nor illegal merely because it contains a class action waiver given that Plaintiff had a sufficient opportunity to opt out. Accordingly, arbitration should be compelled in this case.

**A.     Offer, Acceptance and Consideration are Satisfied.**

"In Illinois, an offer, an acceptance and consideration are the basic ingredients of a contract." *Melena*, 219 Ill. 2d 135, 151-152 (2006) (citing *Steinberg v. Chi. Med. Sch.*, 69 Ill. 2d 320, 329 (1977)) (applying a mandatory arbitration agreement in the employment context as an enforceable contract under Illinois law). In *Melena*, an employer introduced a "Dispute

5

Resolution Program, [in] mailing of materials related to the program to its employees," which the court held "constitute[d] [the employer's] 'offer.'" 219 Ill. 2d at 151-152. Then, "[b]y continuing her employment, plaintiff both accepted the offer and provided the necessary consideration." *Id.* at 153 (citing *Duldulao v. Saint Mary of Nazareth Hosp. Ctr.*, 115 Ill.2d 482, 490 (1987)).

The *Melena* court rejected the plaintiff's argument that her acceptance was illusory simply because the arbitration agreement was presented on a "take it or leave it" basis. 219 Ill. 2d at 151-52 (quoting *Gilmer*, 500 U.S. at 20) (holding "inequality in bargaining power 'is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context.'"). Illinois courts have similarly held, "Illinois law does not void contracts where parties have unequal bargaining power, even if a contract is a so-called 'take-it-or-leave-it' deal and 'consent to [the] agreement is secured because of hard bargaining positions or the pressure of financial circumstances.'" *See Behnke v. AT & T Mobility Serv. LLC,* 2012 WL 2154119, at *5 (C.D. Ill. 2012) (quoting *Koveleskie v. SBC Capital Markets, Inc.*, 167 F.3d 361, 367 (7th Cir. 1999)).

All three elements required under Illinois contract law—offer, acceptance and consideration—similarly exist in this case. Adecco *offered* the Agreement to Plaintiff in return for employing her. Plaintiff *accepted* this offer by signing it and beginning employment with Adecco. Plaintiff further continued employment with Adecco for a period of months during her assignment with Adecco's client.

Last, the Agreement is supported by three independent forms of consideration. First, Adecco's promise to consider Plaintiff for employment (and start of the employment relationship), and, second, the continuation of Plaintiff's employment with Adecco each establish sufficient consideration for the Agreement. *See Melena,* 219 Ill. 2d at 152; *Johnson,* 928 F.

6

Supp. 2d at 1005 (noting there was an "offer and acceptance, as well as valid mutual consideration to support enforcement of the Agreement" where a former employee admitted completing an arbitration agreement as a condition of his employment); *Chatman v. Pizza Hut, Inc.*, 2013 WL 2285804, at *4 (N.D. Ill. 2013) (holding arbitration clause in an employment application was supported by adequate consideration, because of three independent bases: (1) promise to consider Chatman for employment; (2) the continuation of Chatman's employment; and (3) the employer's mutual promise to arbitrate.).

Third, Adecco agreed "that any and all disputes, claims or controversies arising out of or relating to this Agreement, the employment relationship between the parties, or the termination of the employment relationship, shall be resolved by binding arbitration in accordance with the Employment Arbitration Rules of the American Arbitration Association [("AAA")] . . . ." *See* Prentiss Decl., Exh. B, ¶ 1. Adecco therefore mutually promised to submit claims arising from the employment relationship (or termination of the employment relationship) between Plaintiff and Adecco to arbitration. *See Chatman v. Pizza Hut, Inc.*, 2013 WL 2285804, at *4 (N.D. Ill. 2013) (holding that a former employer's "mutual promise to arbitrate is sufficient consideration to support the arbitration agreement."); *Cantrell v. Fidelitone, Inc.*, 2016 WL 1161325, at *2 (citing Illinois law that "the promises exchanged need not be identical or even equal to constitute sufficient consideration."). Thus, there was an offer, acceptance and consideration[1] in this case

---

[1] Plaintiff may attempt to rely upon the Missouri decision of *Baker v. Bristol Care, Inc.*, which held that an arbitration agreement lacked sufficient consideration because the employer retained an unabridged right to modify the agreement, thereby making the agreement to arbitrate illusory and voiding consideration. 450 S.W.3d 770, 777 (Mo. 2014). However, the *Baker* decision was also based on the fact that Missouri law did not recognize continued at-will employment as sufficient consideration. *Id.* at 773. Accordingly, *Baker* does not apply in this case. Parties attempting to make this argument have not been successful in Illinois. *See, e.g., Collier v. Real Time Staffing Services, Inc.*, 2012 WL 1204715, at *3 (N.D. Ill. 2012) (citing *Tinder v. Pinkerton Security*, 305 F.3d 728, 736 (7th Cir. 2002)) (declining to hold that employment at-will language renders a promise to arbitrate illusory).

just as in *Melena*, which decision governs this Court. The Agreement is valid and enforceable under Illinois law and should be applied to compel (individual) arbitration in this case.

**B.    No Valid Defenses Exist.**

No valid defenses exist to defeat the Agreement. Courts often analyze arbitration agreements for unconscionability and unenforceability when they involve class action waivers. *See, e.g., Kinkel v. Cingular Wireless LLC*, 223 Ill. 2d 1, 20 (2006) (unconscionability); *Lewis v. Epic Sys. Corp.*, 823 F.3d 1147 (7th Cir. 2016) (analyzing the enforceability of an arbitration agreement under the National Labor Relations Act ("NLRA")). However, in this case the Agreement is neither unconscionable nor illegal because it has an opt out provision.[2]

**1.    The Agreement is Not Unconscionable.**

An arbitration agreement may be invalidated if it is procedurally unconscionable, substantively unconscionable, or both. *See Williams v. TCF Nat. Bank*, No. 12 C 05115, 2013 WL 708123, at *6 (N.D. Ill. Feb. 26, 2013) (citing *Kinkel*, 223 Ill. 2d at 21). "Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it . . . ." *Kinkel*, 223 Ill. 2d at 22. "Substantive unconscionability concerns the actual terms of the contract and examines the relative fairness of the obligations assumed." *Id.* at 28 (internal citations omitted).

Courts consider the circumstances surrounding the arbitration agreement, including the presence of conspicuous language and mutuality of obligations. *Tortoriello v. Gerald Nissan of N. Aurora, Inc.*, 379 Ill. App. 3d 214, 238 (2008). For example, the *Tortoriello* court held an arbitration agreement, which included a class action waiver, was neither procedurally nor

---

[2] *See also, e.g., Carbajal v. H&R Block Tax Servs., Inc.*, 372 F.3d 903, 905–07 (7th Cir. 2004) (rejecting argument that arbitration agreement was unconscionable under Illinois law); *Oblix, Inc. v. Winiecki*, 374 F.3d 488, 491 (7th Cir. 2004) (rejecting argument that agreement was contract of adhesion due to the disparity in bargaining power under Illinois law).

8

substantively unconscionable, in part, because "[t]he signaling provision was the bolded, all-capitalized statement," and the parties obligations were mutual even though not "precise[ly] proportional." *Id.* at 179. Further, the Illinois Supreme Court found that "other state courts have invalidated class action waivers when the contract containing the waiver is burdened by other unfair features, rendering it substantively unconscionable when taken as a whole." *Kinkel*, 223 Ill. 2d at 35. However, a class action waiver is not unconscionable *per se*. *Id.* at 38. Instead, "a class action waiver will *not* be found unconscionable if the plaintiff had a meaningful opportunity to *reject* the contract term *or* if the agreement containing the waiver is not burdened by other features limiting the ability of the plaintiff to obtain a remedy for the particular claim being asserted in a cost-effective manner." *Id.* at 41 (emphasis added).

The Agreement in this case is, therefore, neither procedurally nor substantively unconscionable given its meaningful opt out opportunity. Moreover, the Agreement's terms are not so difficult to find, read, or understand that Plaintiff could not have been aware that she was agreeing to a dispute resolution and arbitration agreement. The Agreement is clearly titled, contains only 14 short paragraphs, and contains bolded language conspicuously identifying the class action waiver. Additionally, the Agreement is substantively fair based on its mutuality of obligations. For example, Adecco's ability to amend with reasonable prior notice was matched by Plaintiff's ability to opt out within 30 days. Plaintiff had a meaningful opportunity to reject the Agreement within 30 days after signing. Plaintiff could have opted out by simply submitting a form to Adecco stating that she wished to opt out and not be subject to the Agreement; however, Plaintiff chose not to opt out.

9

#### 2. The Class Action Waiver Does Not Render the Agreement Illegal

The United States Supreme Courts has repeatedly held that arbitration agreements and express class action waivers may be enforceable under the FAA. *See e.g. Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2312 (2013) (finding no grounds under the FAA, including public policy, on which to invalidate a merchant's waiver of class action arbitration); *Lewis v. Advance Am., Cash Advance Ctrs. Of Ill., Inc.*, No. 13-cv-942-JPG-SCW, 2014 WL 4725, *3 (N.D. Ill. Jan. 6, 2014) (finding an arbitration class action waiver not unconscionable pursuant to the FAA's broad enforcement objectives) (citing *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 351 (2011)).

Presently, there is a circuit split among federal circuits as to whether class actions waivers violate an employee's right to engage in protected concerted activities under the NLRA. *Compare Cellular Sales of Mo. v. Nat'l Labor Relations Bd.*, 824 F.3d 772, 776 (8th Cir. 2016) *and Murphy Oil USA, Inc. v. N.L.R.B*, 808 F.3d 1013, 1018 (5th Cir. 2015), *with Lewis*, 823 F.3d at 1156 *and Morris v. Ernst & Young, LLP,* 834 F.3d 975, 980, 986-987 (9th Cir. 2016). The United States Supreme Court granted certiorari to address the aforementioned circuit split. *See Murphy Oil USA, Inc.*, No. 16-307, 2017 WL 125666 (U.S. Jan. 13, 2017); *Epic Sys. Corp. v. Lewis*, No. 16-285, 2017 WL 125664 (U.S. Jan. 13, 2017); *N.L.R.B. v. Ernst & Young, LLP v. Morris*, No. 16-300, 2017 WL 125665 (U.S. Jan. 13, 2017).

In *Murphy Oil USA*, the Fifth Circuit held that "requiring employees to relinquish their right to pursue class or collective claims in all forums by signing the arbitration agreements" does not violate Section 8(a)(1) of the NLRA.[3] 808 F.3d at 1018. By contrast, the Seventh

---

[3] In *Cellular Sales of Missouri*, the Eighth Circuit held that an employer's attempt to enforce a class action waiver did not violate the NLRA, and upheld a previous decision finding "that a mandatory agreement requiring individual arbitration of work-related claims" likewise did not violate the NLRA. 824 F.3d at 776 (citing *Owen v. Bristol Care, Inc.*, 702 F.3d 1050-1053-55 (8th Cir. 2013)).

Circuit found that a class action waiver violated the NLRA because it prohibited collective action. *Lewis*, 823 F.3d at 1155-1156; *see also Morris*, 834 F.3d at 980, 986-987 (joining the Seventh Circuit in finding that the NLRA gave employees the substantive right to pursue work-related legal claims together, i.e. through collective action).

Notably however, none of the key circuit-splitting cases contained an opt out provision in the arbitration agreement. *See Lewis*, 823 F.3d at 1155; *Morris,* 834 F.3d at 983, fn. 4; *Murphy Oil USA*, 808 F.3d at 1015. The *Lewis* court disclosed its view on opt out provisions, but merely in *dicta*—"[w]e are aware that the circuits have some differences of opinion in this area, although those differences do not affect our analysis here. The Ninth Circuit has held that an arbitration agreement mandating individual arbitration may be enforceable where the employee had the right to *opt out* of the agreement *without penalty* . . . ." *See* 823 F.3d at 1155 (citing *Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d 1072, 1077 (9th Cir. 2014)) (emphasis added). Three months later, the *Morris* court confirmed that *Johnmohammadi* remains good law "because the employee there could have opted out of the individual dispute resolution agreement and chose not to." *Morris,* 834 F.3d at 983, fn. 4.

Post–*Lewis*, at least one district court within the Seventh Circuit enforced an arbitration agreement with a class action waiver. *See Scroggins v. Uber Techs., Inc.*, No. 116CV01419SEBMJD, 2017 WL 373299, *2-3 (S.D. Ind. Jan. 26, 2017); *see also Lee v. Uber Techs., Inc.*, No. 15 C 11756, 2016 WL 5417215, at *6, fn. 9 (N.D. Ill. Sept. 21, 2016) (explaining that *Lewis* left open the issue of whether an opt out provision would require the court to compel arbitration). In *Lewis,* the court found that "[a] contract that limits Section 7 rights that is agreed to as a condition of continued employment qualifies as 'interfer[ing] with' or 'restrain[ing] ... employees in the exercise' of those rights." *Lewis*, 823 F.3d at 1155 (quoting 29

11

U.S.C. § 157(a)(1)). The *Scroggins* court found an agreement with an opt out distinguishable, noting that the plaintiff had the opportunity to opt out of the arbitration provisions, even after the plaintiff began his employment, "thereby preserving his right to pursue a collective action." *Scroggins*, 2017 WL 373299, at *3. The *Scroggins* reasoning is analogous to that of the Ninth Circuit. *See Johnmohammadi*, 755 F.3d at 1076-1077 (holding that defendant did not "interfere[] with or restrain[] Johnmohammadi in the exercise of her right to file a class action. If she wanted to retain that right, nothing stopped her from opting out of the arbitration agreement."); *see also Morris*, 834 F.3d at 983, fn. 4. The *Scroggins* court also found that *N.L.R.B. v. Stone*, referenced within *Lewis*, was distinguishable because the plaintiff's opportunity to opt out of the class and/or concerted action waiver. *Scroggins*, 2017 WL 373299, at *3, fn. 5 (citing *N.L.R.B. v. Stone*, 125 F.2d 752 (7th Cir. 1942)) ("Neither *Stone* nor *Lewis* addressed the effect of a clear opt-out provision on the validity of a class action waiver").

The Agreement in this case is valid and enforceable, notwithstanding the inclusion of a class action waiver, because Plaintiff had the option to opt out. Plaintiff may argue that the Agreement is a prohibited restraint on concerted activity pursuant to the NLRA based on recent circuit court opinions. However, to demonstrate a provision is prohibited by the NLRA, Plaintiff must prove that Adecco *interfered with, restrained, or coerced her* in the exercise of her Section 7 rights. Plaintiff had the opportunity to opt-out of the Agreement, and in fact was allowed 30 days to do so as in *Scroggins* and *Johnmohammadi*. Plaintiff chose not to; therefore she became bound by the terms of the Agreement.

Moreover, there is no evidence that Adecco coerced Plaintiff into waiving her right to file a class action because the Agreement was not a condition of employment. The Agreement specifically provides that an employee "who opts out . . . will not be subject to any adverse

12

employment action as a consequence of that decision and may pursue available legal remedies without regard to the Agreement." *See* Prentiss Decl., Exh. B, ¶ 9. Even if Plaintiff were to argue that the electronic onboarding process required her to accept the Agreement in order to begin employment, the Agreement gave Plaintiff 30 days thereafter to opt-out and remain employed. *See* Prentiss Decl., Exh. B, ¶ 9.

Therefore, Adecco did not interfere with or restrain Plaintiff in the exercise of her right to file a class action. As the courts in *Scroggins* and *Johnmohammadi* reasoned, had Plaintiff wanted to retain her right to file a class action, nothing stopped her from opting out of the Agreement. Absent any evidence that Adecco coerced, interfered with, or restrained Plaintiff's rights to engage in concerted activity, there is no violation of the NLRA. The Agreement cannot be deemed unenforceable without evidence of conduct prohibited by governing law. Accordingly, the Court should enforce the Agreement and compel arbitration of Plaintiff's claims.

## II. Alternatively, This Court Should Stay These Proceedings.

Courts may stay litigation where the United States Supreme Court has granted certiorari on a relevant legal issue. *See Cook v. Frank*, 1989 WL 64370, at *3 (N.D. Ill. June 13, 1989); *see also Tex. Indep. Producers & Royalty Owners Ass'n v. EPA*, 410 F.3d 964, 980 (7th Cir. 2004) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)) (courts maintain the inherent power to stay proceedings in the interest of "economy of time and effort for itself, for counsel, and for litigants"). During its October 2017 term, the Court will address the above circuit split. *Murphy Oil USA*, 2017 WL 125666; *Lewis*, 2017 WL 125664; *Morris*, 2017 WL 125665. If this Court is not inclined to grant this motion, it should stay the proceedings in light of the Supreme Court's expected decision, which will likely be controlling on the issues raised herein.

13

### III.    Plaintiff's Claims Present Arbitrable Issues and Adecco Has Not Waived its Rights

After determining the Agreement is valid and enforceable, the Court should decide that Plaintiff's claims fall within the substantive scope of the Agreement. "[O]nce it is clear … that the parties have a contract that provides for arbitration of some issues between them, any doubt concerning the scope of the arbitration clause is resolved in favor of arbitration as a matter of federal law." *Allscripts Healthcare, LLC v. Etransmedia Tech., Inc.*, 188 F. Supp. 3d 696, 700 (N.D. Ill. 2016) (quoting *Gore v. Alltel Commc'ns, LLC*, 666 F. 3d 1027, 1032 (7th Cir. 2012)).

The Agreement requires "that any and all disputes, claims, or controversies arising out of or relating to this Agreement, the employment relationship between the parties, or the termination of the employment relationship shall be resolved by binding arbitration in accordance with the Employment Arbitration Rules of the [AAA] then in effect." Prentiss Decl., Exh. B ¶ at 1. Furthermore, Plaintiff agreed that BOA is an intended third party beneficiary of the Agreement and that "any dispute that may be asserted against [BOA] due to [Plaintiff]'s temporary work assignment at [BOA] shall be resolved pursuant to [the Agreement] in the same manner as claims made against [Adecco]." *See* Prentiss Decl., Exh. B, ¶ 10. Plaintiff's allegations related to unpaid wages under the FLSA and IMWL arise out of and relate to her employment relationship with Adecco and her temporary work assignment at BOA. *See* Prentiss Decl., Exh. B at ¶ 1. Thus, Plaintiff's claims fall under the scope of the Agreement.

Moreover, Adecco has not waived its right to seek arbitration of the issues raised in Plaintiff's Complaint. Adecco has raised its rights early in this case. Accordingly, the requirements of the FAA are clearly satisfied and the Court should compel arbitration pursuant to Section 4 of the FAA. *See* 9 U.S.C. § 4.

**IV.     The FAA Requires a Stay of These Proceedings.**

Section 3 of the FAA provides, "[t]he court in which such suit is pending, upon being satisfied that the issue involved may be referred to arbitration under such agreement, shall on application of one of the parties stay the trial of the action until such arbitration has occurred pursuant to the terms of the agreement . . . ." 9 U.S.C. § 3. Accordingly, this case should be stayed pending completion of the arbitration of Plaintiff's claims asserted in the Complaint.

## CONCLUSION

The Court should compel arbitration of the issues raised in the Complaint on an individual (not class) basis for the reasons established above. The Court should further stay this case while the parties arbitrate. Alternatively, the Court should stay these proceedings in light of the Supreme Court's grant of certiorari in *Murphy Oil USA*, *Lewis*, and *Morris*.

Dated:  March 22, 2017

Respectfully submitted,

**ADECCO USA, INC.,**
**Defendant**

By: /s/ Pamela J. Leichtling
One of Its Attorneys

Paul E. Starkman, Esq.
Pamela J. Leichtling, Esq.
**Clark Hill PLC**
130 E. Randolph Street, Suite 3900
Chicago, IL 60601
Phone: (312) 985-5900
Fax: (312) 985-5999
pstarkman@clarkhill.com
pleichtling@clarkhill.com

John P. Marino, Esq. (Admitted *pro hac vice*)
Yash B. Dave, Esq. (Admitted *pro hac vice*)
**Smith, Gambrell & Russell, LLC**
50 North Laura Street, Suite 2600
Jacksonville, FL 32202
Phone: (904) 598-6104
Fax: (904) 598-6204
jmarino@sgrlaw.com
ydave@sgrlaw.com

15

## IN THE UNITED STATES DISTRICT COURT
## THE NORTHERN DISTRICT OF ILLINOIS

ADRIAN SMITH, on behalf of herself and
all others similarly situated,

    Plaintiffs,      Case No.: 1:17-cv-00286-ARW

vs.

BANK OF AMERICA, N.A., BANK OF
AMERICA CORPORATION and
ADECCO USA, INC.,

    Defendants.

_____/

### DECLARATION OF RACHEL PRENTISS

 I, RACHEL PRENTISS, declare as follows:

  1.  I am the Manager of Contracts/OnBoarding for Defendant Adecco USA, Inc. ("Adecco"). Adecco is one of the largest staffing companies in the United States that provides a full range of recruitment and staffing solutions to meet the evolving workforce needs of Adecco's clients and the temporary employees ("associates") who are placed for employment at client sites. Adecco maintains its corporate headquarters in Jacksonville, Florida, but has branches and offices in 47 states, including California.

  2.  I have worked for Adecco or its predecessor entities since October 2005. As the Manager of Contracts/OnBoarding, I am responsible for the overall processes and implementation of policies involving documentation related to the hiring of associates to be placed with Adecco clients nationwide. The facts contained herein are true based on my personal knowledge, and if called upon as a witness in this case, I could and would testify competently to the truth thereof.

  3.  Adecco maintains a proprietary database known as Custom Match ("CM") that houses the personnel information of Adecco associates. Each record entry in the CM file of each associate is created at or near the time of the event by someone with personal knowledge of the

1



event. The associates CM files are kept in the regular course of business and accurately depict the events and activities related to those associates.

4.      Similar to the CM system, Adecco uses US Verify in the regular course of business. US Verify is a web based application used by Adecco for all associates at the time of their hire.     The documents and records contained therein are true and correct copies of documents created or acknowledged by associates or other persons with personal knowledge of the records or events stated therein. In the normal course and scope of my duties, I can and regularly do, access associates' on-boarding documents stored in the US Verify system. I am also familiar with the way in which these documents are created and maintained.

5.      I have reviewed Plaintiff Adrian Smith's ("Smith") CM file and all the on-boarding documents executed and processed by Smith in her US Verify file. Smith was an associate who was placed by Adecco in the temporary position with Bank of America (the "Client"). Smith's temporary assignment with the Client commenced in approximately July 2015 and terminated in approximately October 2015.

6.      Generally, applicants who seek placement through Adecco, must first register on AdeccoUSA.com, create a username and password, and complete an application for consideration for the position. If the applicant meets certain minimum requirements for the position, an Adecco recruiter typically interviews the applicant by phone and sends a link via an e-mail for the applicant to complete any testing or assessments needed for the position. If an applicant is ultimately selected for the position, the recruiter will notify the applicant that he/she must complete new hire documents through a web based application known as US Verify.

7.      Adecco has utilized US Verify as its employee on-boarding tool for individuals seeking to be placed for temporary positions at Adecco clients since 2010. US Verify is a web-based tool that delivers new-hire on-boarding forms electronically to individuals selected for assignment. In addition to the I-9 form, US Verify allows employees to view and complete the Criminal Conviction Questionnaire, Federal W-4 form, applicable State Tax forms, Adecco personnel forms such as, the payroll choice form, mandatory contact notice form, background

2

authorization and release, reference check release, notice of health care benefit options, a copy of the employee handbook, as well as any state specific necessary forms regarding disability, family and pregnancy leave. US Verify also allows Adecco to bundle any client specific forms that may be applicable for the position for which the associate has been selected. In short, US Verify serves as a single repository for associates to complete necessary new hire and on-boarding documents specific to an assignment for which an associate has been placed by Adecco.

8.     US Verify has the functionality to securely deliver the on-boarding forms either at an Adecco office or remotely wherever the employee is able to access a computer. The process begins by an Adecco Recruiter (or other qualified Adecco employee) creating a new record in US Verify for the associate. The Recruiter enters the associate's personal information, including name and email address, into US Verify to create an initial record. This will trigger an automatic email to be sent to the associate using the email address provided by the associate, with the websecure link to complete the forms.

9.     Based on information available to me on US Verify, Smith was sent an email by an Adecco representative on June 18, 2015. On the same date, Smith accessed US Verify and completed her on-boarding documents. Smith electronically signed her E-Signature Agreement on June 18, 2015 and completed and electronically signed her on-boarding documents that same day.

10.     In order to access the on-boarding documents in US Verify, the associate must do the following:

      a.  Click on an individualized web link
      b.  Enter her or her registered e-mail address

11.     Upon accessing US Verify, the associate is shown the list of documents that the associate must complete in sequential order. The very first document that the associate can access is the "Electronic Signature Agreement." Before the associate can proceed in accessing any other document the associate must acknowledge and agree to the Electronic Signature Agreement. The Electronic Signature Agreement specifically states the following:

3

By providing your electronic signature below, you:

- Agree that your electronic signature holds the same value as your signature,
- Agree that you have fully read and understand all information preceding your electronic signature in each location where our electronic signature appears.

By clicking the "Electronically Sign This Form" button below I certify that the above information is true and correct, and I agree to the conditions of hiring.

The associate is then directed to click on a green highlighted button stating "Electronically Sign This Form." A copy of the Electronic Signature Agreement signed electronically by Smith is attached herein as Exhibit A.

12.     Upon acknowledging agreement to the Electronic Signature Agreement and completing an initial form regarding the associate's criminal history, the associate is directed to the Dispute Resolution and Arbitration Agreement form (the "Dispute Resolution Agreement").

13.     The associate is given the ability to download or print the Employment Arbitration Rules and Mediation Procedures of the American Arbitration Association ("AAA Rules") before proceeding to the Dispute Resolution Agreement form. Additionally, at any time after the onboarding process is complete, the associate can request to view a hardcopy of the AAA Rules at an Adecco Branch, or they can request that the Branch "reassign" the electronic copy of the AAA Rules to the associate to give the associate another opportunity to download or print the AAA Rules.

14.     Paragraph 1 of the Dispute Resolution Agreement states that "the Company and Employee agree that any and all disputes, claims, or controversies arising out of or relating to this Agreement, the employment relationship between the parties, or the termination of the employment relationship shall be resolved by binding arbitration in accordance with the Employment Arbitration Rules of the American Arbitration Association then in effect." Paragraph 1 of the Dispute Resolution Agreement also states in bold capitalized letters that "**BY SIGNING THIS AGREEMENT, THE PARTIES HEREBY WAIVE THEIR RIGHT TO**

4

**HAVE ANY DISPUTE, CLAIM OR CONTROVERSY DECIDED BY A JUDGE OR JURY IN A COURT.**"

15.     Associates must electronically sign the Dispute Resolution Agreement by clicking on a green button indicating "Electronically Sign This Form" before the associate can proceed with the next document in US Verify.  Smith electronically signed the Dispute Resolution Agreement before proceeding with the next on boarding document.  A representative for Adecco co-signed the Dispute Resolution Agreement on behalf of the Company.  A true and correct copy of Smith signed Dispute Resolution Agreement is attached herein as Exhibit B.  The associate has the ability to print or download the Dispute Resolution Agreement.

16.     Paragraph 9 of the Dispute Resolution Agreement allows an associate to opt out of the Dispute Resolution Agreement by requesting an Opt Out form via a specific link to an e-mail address provided for within Paragraph 9.  If the associate desires to opt out, the associate must click on the e-mail link and request a copy of an Opt Out form from Adecco's Human Resources Department.  The HR Department then delivers the Opt Out form to the associate via U.S. Verify and the associate must then submit the signed Opt Out form within thirty days of signing the Dispute Resolution Agreement.  The Opt Out form is then uploaded into US Verify and made a part of the associate's US Verify records.  Paragraph 9 of the Dispute Resolution Agreement provides that the associate and Adecco have mutually accepted the terms of the Dispute Resolution Agreement if the associate does not opt out in a timely manner.

17.     Based on my review of Smith's US Verify records and confirmation with the designated custodian of Opt Out forms with Adecco's HR Department, Adecco did not receive any e-mail or any request by Smith asking for the Opt Out form.  Adecco has no record of a signed and executed Opt Out form from Smith and none exists in her US Verify file.

18.     The very last Adecco form (before client forms) that an associate must complete as part of the on-boarding process in US Verify is the "Acknowledgment of Company Form." This form lists other documents that were part of on-boarding that were made available to employees as part of the package on US Verify (in other words, they are the read-only forms that

do not require an electronic signature). The associate must click on a green "Electronically Sign This Form" button before the on-boarding process can be completed. A copy of Smith's signed Acknowledgement Form is attached herein as Exhibit C.

19.     Upon completing the on-boarding process, the associate is given the opportunity to save or print each and every document contained in the process.

20.     Adecco has a substantial interest in the accuracy of these records, as they are its primary means of verifying that a newly-engaged associate (i) has received the information presented in the onboarding process, (such as the company's workplace violence policy and policy against harassment), (ii) has provided certain information required for human resources and payroll purposes (such as a taxpayer identification number and emergency contact information), and (iii) has agreed to abide by various company rules.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21st day of March, 2017, at Melville, New York.

RACHEL PRENTISS

## E-Signature Agreement

US Verify is a web-based hiring process that greatly reduces paperwork. You will be asked to provide **your** signature electronically on the required forms.

By providing your electronic signature below, **you:**

- Agree that your electronic signature holds the same value as your **signature.**
- Agree that you have fully read and understand all information preceding your electronic signature in each **location where** your electronic signature appears.

**By clicking the "Electronically Sign This Form" button below I certify that the above information is true and correct, and I agree to the conditions of hiring.**

**Your Signature:** ADRIAN D SMITH (e-sign I agree) **Date:** 06/18/2015



### Dispute Resolution and Arbitration Agreement for Consultants/Associates

This Dispute Resolution and Arbitration Agreement for Consultants/Associates ("Dispute Resolution Agreement") is entered between Adecco USA, Inc., its successors and assigns and its officers, directors, employees, affiliates, subsidiaries and parent companies (collectively referred to as the "Company"), and ADRIAN D SMITH ("Employee").

### Recitals

A.     The Company desires to consider Employee for placement or the continuation of Employee on temporary work assignments at Company's client(s) ("Client(s)");

B.     Employee is desirous of such consideration or continued assignment; and

C.     Employee and the Company desire to resolve any disputes concerning the terms, conditions or benefits of Employee's employment.

NOW THEREFORE, based on the above, and in consideration of the mutual covenants and conditions set forth herein, the parties hereto agree as follows:

1.     It is the Company's goal that workplace disputes or claims be handled responsibly and on a prompt basis. Employee and the Company are encouraged to take advantage of the procedures in the Company's Open Door Policy and solve problems and disputes informally, through dialog with Employee's supervisor, manager or Human Resources representative. Absent resolution through such process, the Company and Employee agree that any and all disputes, claims or controversies arising out of or relating to this Agreement, the employment relationship between the parties, or the termination of the employment relationship, shall be resolved by binding arbitration in accordance with the Employment Arbitration Rules of the American Arbitration Association then in effect. These Rules can be obtained from the Company Human Resources Department or on line at www.adr.org. The agreement to arbitrate includes any claims that the Company may have against Employee, or that Employee may have against the Company or against any of its officers, directors, employees, agents, or parent, subsidiary, or affiliated entities, except as set forth below. The arbitration shall take place in the county where Employee is or was last employed by the Company.  The Company and Employee agree that the aggrieved party must give written notice of any claim to the other party no later than the expiration of the statute of limitations (deadline for filing) that the law sets forth for such claim.  This Agreement shall be enforceable under and subject to the Federal Arbitration Act, 9 U.S.C. Sec 1 *et seq.* and shall survive after the employment relationship terminates.  **BY SIGNING THIS AGREEMENT, THE PARTIES HEREBY WAIVE THEIR RIGHT TO HAVE ANY DISPUTE, CLAIM OR CONTROVERSY DECIDED BY A JUDGE OR JURY IN A COURT.**

2.     Except as it otherwise provides, this Dispute Resolution Agreement also applies, without limitation, to disputes regarding the employment relationship, trade secrets, unfair competition, compensation, breaks and rest periods, termination, or harassment and claims arising under the Uniform Trade Secrets Act, Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act, Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, and all other state statutory and common law claims.

3.     The arbitration requirement does not apply to (i) claims for workers compensation, state disability insurance and unemployment insurance benefits; (ii) claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance; however, this Dispute Resolution Agreement does apply to claims for breach of fiduciary duty, for penalties, or alleging any other violation of the Employment Retirement Income Security Act of 1974, as amended, even if such claim is combined with a claim for benefits; and (iii) disputes that may not be subject to predispute arbitration agreements as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203).

4.     Regardless of any other terms of this Dispute Resolution Agreement, claims may be brought before an administrative agency if applicable law permits access to such an agency notwithstanding the existence of an agreement to arbitrate. Such administrative claims may include without limitation claims or charges brought before the Equal Employment Opportunity Commission (www.eeoc.gov), the U.S. Department of Labor (www.dol.gov), the National Labor Relations Board (www.nlrb.gov), or the Office of Federal Contract Compliance Programs (www.dol.gov/esa/ofccp). Nothing in this Dispute Resolution Agreement shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration.

5.     Although Employee will not be retaliated against, disciplined or threatened with discipline as a result of his or her exercising his or her rights under Section 7 of the National Labor Relations Act by the filing of or participation in a class, collective or representative action in any forum, the Company may lawfully seek enforcement of this Dispute Resolution Agreement including the



AOP42012     Version 05/15/12

following class, collective and/or representative action waivers under the Federal Arbitration Act and seek dismissal of such class, collective or representative actions or claims.

6.    Employee or the Company may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

7.    **BY SIGNING THIS AGREEMENT, THE PARTIES AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS AND/OR COLLECTIVE PROCEEDING.**

8.    **FURTHERMORE, BY SIGNING THIS AGREEMENT, THE PARTIES AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN THEIR INDIVIDUAL CAPACITY AND NOT IN ANY REPRESENATATIVE PROCEEDING UNDER ANY PRIVATE ATTORNEY GENERAL STATUTE ("PAGA CLAIM"), UNLESS APPLICABLE LAW REQUIRES OTHERWISE.  IF THE PRECEDING SENTENCE IS DETERMINED TO BE UNENFORCEABLE, THEN THE PAGA CLAIM SHALL BE LITIGATED IN A CIVIL COURT OF COMPETENT JURISDICTION AND ALL REMAINING CLAIMS WILL PROCEED IN ARBITRATION.**

9.    Within 30 days after signing this Agreement, Employee may submit a form stating that Employee wishes to opt out and not be subject to the Dispute Resolution Agreement. Employee must submit a signed and dated statement on a "Dispute Resolution and Arbitration Agreement for Consultants/Associates Opt Out Form" ("Form") that can be obtained from the Company Human Resources Department Send your request for the Opt-Out Form to: associatearbitration@adeccousa.com .  An Employee who opts out as provided in this paragraph will not be subject to any adverse employment action as a consequence of that decision and may pursue available legal remedies without regard to the Dispute Resolution Agreement. Should Employee not opt out of the Dispute Resolution Agreement in a timely manner, Employee and the Company will be deemed to have mutually accepted the terms of the Dispute Resolution Agreement.

10.    It is understood and agreed by the parties that a Client and its affiliates are intended to be third party beneficiaries to this Dispute Resolution Agreement. Although the Client and its affiliates are not the Employee's employer, any disputes that may be asserted against Client or its affiliates due to Employee's temporary work assignment at Client shall be resolved pursuant to this Dispute Resolution Agreement in the same manner as claims made against the Company.

11.    An Employee has the right to consult with counsel of the Employee's choice concerning this Dispute Resolution Agreement. Employee has read this Dispute Resolution Agreement carefully, fully understands the meaning of its terms and is signing it knowingly and voluntarily.

12.    It is against Company policy for any Employee to be subject to retaliation if he or she exercises his or her right to assert claims under this Dispute Resolution Agreement. If any Employee believes that he or she has been retaliated against by anyone at the Company, the Employee should immediately report this to the Company Human Resources Department.

13.    The Company may change or modify the terms of the Dispute Resolution Agreement at any time with reasonable prior notice to Employee.  It is understood that future changes will supersede or eliminate, in whole or in part, the terms of the Dispute Resolution Agreement.  Current versions of the Dispute Resolution Agreement will be posted by the Company on the Company's internet site or such other location(s) designated by the Company.

14.    If any provision(s) of this Dispute Resolution Agreement is declared overbroad, invalid or unenforceable such provision(s) shall be severed from this Dispute Resolution Agreement and, the remaining provisions of this Dispute Resolution Agreement shall remain in full force and effect and shall be construed in a fashion which gives meaning to all of the other terms of this Dispute Resolution Agreement.

IN WITNESS WHEREOF, the parties have voluntarily and knowingly executed this Dispute Resolution Agreement on the day and year set forth below.

EMPLOYEE                                                                          ADECCO USA INC.

ADRIAN D SMITH (e-sign I agree)                     _____

DATE: 06/18/2015                                                    DATE: 06/18/2015

AOP42012    Version 05/15/12

**Name:** ADRIAN D SMITH

EMPLOYEE HANDBOOK
EMPLOYMENT ARBITRATION RULES
HEALTH INSURANCE MARKETPLACE COVERAGE OPTIONS
401(K) PLAN RECRUITMENT DOCUMENT
ACCIDENT BENEFIT SUMMARY
CANCER BENEFIT SUMMARY
GS BENEFITS ENROLLMENT GUIDE
TEXT US FLYER

I acknowledge receipt of, and have agreed to read, and hereby accept, this:

EMPLOYEE HANDBOOK
EMPLOYMENT ARBITRATION RULES
HEALTH INSURANCE MARKETPLACE COVERAGE OPTIONS
401(K) PLAN RECRUITMENT DOCUMENT
ACCIDENT BENEFIT SUMMARY
CANCER BENEFIT SUMMARY
GS BENEFITS ENROLLMENT GUIDE
TEXT US FLYER

ADRIAN D SMITH  06/18/2015        ADRIAN D SMITH (e-sign I agree)
Printed Name and Date.                Signature

08/15/11


EXHIBIT
C